# Federal Defenders
## OF NEW YORK, INC.

Eastern District
16 Court Street-3rd Floor, Brooklyn, NY 11241
Tel: (718) 330-1200 Fax: (718) 855-0760

Leonard F. Joy
*Executive Director and*
*Attorney-in-Chief*

*Eastern District*
Peter Kircheimer
*Attorney-in-Charge*

January 4, 2006

The Honorable Edward R. Korman
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza
Brooklyn, New York   11201

Re:  **United States v. Richard Smith**

Dear Judge Korman:

I write to respond to the Court's inquiry as to the factual basis for Richard Smith's guilty plea.  At the Fatico hearing the government presented evidence in support of its claims that there was a basis to support Smith's guilty plea.  In addition the government attempted to introduce evidence supporting its claims that Smith's conduct was reckless.  Since Smith has pled guilty, pursuant to an agreement with the government in which he has agreed that his conduct was reckless, he continues to abide by the agreement and does not now assert a challenge to recklessness.  Accordingly, this letter does not argue that question.[1]

---

[1] The addendum to the Presentence Report recommends that the Court find a base offense level of ten for Seaman's Manslaughter.  It argues that the facts support only negligence and not recklessness.  Defendant accepted the government's position of recklessness in signing the plea agreement.  Defendant does not now seek to breach the agreement by arguing for probation's position.  However, this Court has its own independent obligation to decide whether the stipulation to recklessness is supported by the record.  In U.S. v. Granik, 386 F.3d 404 (2nd Cir. 2004), the Court of Appeals held that a factual stipulation in a plea agreement does not fix the question as a matter of law.  The Court cited the U.S.S.G. § 6B1.4 (d) policy statement:

> The Court is not bound by the stipulation, but may
> with the aid of the presentence report, determine the
> facts relevant to sentencing.

Granik found an independent obligation of the Court to determine sentencing facts despite the stipulation.  Here, prompted by the addendum to the presentence report, the Court has the independent obligation to determine the existence of recklessness despite the plea agreement.

1

The government maintains that Mr. Smith's use of Tramadol was a factor which contributed to his physical condition that caused him to fall asleep while piloting the Staten Island ferry. Further, the government argues that Smith was culpable for using Tramadol. The government has failed to prove that Tramadol caused Smith's loss of consciousness. However their expert testimony suffices to corroborate Smith's guilty plea that he fell asleep due to reporting for work overtired, in unfit physical condition and having taken medication.

This Court has already found that the government did not establish that Tramadol caused Smith's lapse. At the November 4, 2005 sentence of Dr. Tursi the Court summarized the government's Tramadol evidence. The Physician's Desk Reference suggests that one in four Tramadol users experience somnolence. The government's expert on pharmacology, Dr. Reidenberg, could only say that somnolence was a side effect in some people, but could not say that it happened here. The government's expert testimony did not establish that Tramadol caused Smith's loss of consciousness.

Smith pled to reporting to work overtired, in impaired physical condition and having taken various medications, all of which contributed to his falling asleep at the wheel. The government corroborated Smith's belief about his culpable acts by Dr. Dinges testimony that sleep was the likely cause of the accident. They also adduced Scheidt's testimony that stroke, seizure and fainting were unlikely. The government's proof that Smith's admissions were a reasonable basis for guilt was Dinges' and Scheidt's opinions that what Smith said in his allocution was likely and that other causes for the accident were unlikely. Dr. Dinges corroborated Smith's statement that he lost consciousness, falling asleep due to his impaired physical condition. He opined that Smith's actions were consistent with sleep and inconsistent with stroke, seizure or other involuntarily caused loss of consciousness because Smith remained standing and made no compensatory response such as evasive action. He also thought that statistically such accidents were more likely to result from sleep than stroke. Supporting the statistical likelihood argument were Smith's age and the time of day which were consistent with a sleep episode. In addition Dinges found a sleep deficit possible due to evidence of insomnia in the form of sleep medication prescriptions as well as family evidence that Smith got less sleep then normal the night before the accident. Sleep deficit can be a causal factor in falling asleep. Dinges discounted seemingly contrary factors such as Smith's conversing with a crew member and the prompt of the crew member noting the k.v. buoy and leaving the pilot house. He stated that losing situational awareness and sense of time and place is characteristic of microsleep and thus not inconsistent with the prompt of the deck hand noting the k.v. buoy.

All of these factors led Dinges to give the expert opinion that falling asleep was a likely cause of the accident. Smith's falling asleep was likely caused by age, time of day, sleep deficit and fatigue. Dinges could not say conclusively that Smith fell asleep or if so why. He could only say that it was most likely that he did so.

The government has offered additional evidence that sleep was the likely cause of the lapse. There was family evidence that over a period of time Smith had gotten less sleep than normal and that he had recently done physical work leaving him tired. A crew member said Smith told him prior to boarding the ferry that he should not have reported to work suggesting knowledge by Smith that he was not in appropriate condition. According to the government, Captain Gansas reported that Smith said after the accident that he must have fallen asleep. These facts corroborate Smith's plea. They corroborate that Smith did fall asleep, that tiredness was the cause and that he knew he was not in appropriate condition to operate the ferry.

Dr. Scheidt further corroborated Smith's admission that he caused the crash by loss of consciousness due to overtiredness by discounting possible alternate medical causes. Although Scheidt ruled out nothing, he testified to a panoply of possible medical problems suggested by Smith's medical record. He found each unlikely to have caused Smith's loss of consciousness. He ruled out stroke on the grounds of lack of evidence in the CAT scan. He ruled out syncope due to cardiac arrhythmia because of lack of evidence from telemetry during hospitalization. He found fainting due to postural hypertension from prolonged standing unlikely because the onset would not be sudden, Smith would have felt faint and been able to sit on his stool or walk around to avert it. He found vasovagal syncope unlikely because of lack of history and because Smith did not fall down. He acknowledged that the hospital tilt table test caused Smith's blood pressure to drop which was a diagnostic tool for vasovagal syncope but suggested that faintness during the tilt test was more probably a result of the multiple post heart surgery medications. Although the stated conclusion of the test was vasovagal syncope, he believed that incorrect. He relied on lack of falling and the ability to take countermeasures as an indication that fainting due to sudden change in blood pressure did not happen. He ruled out a seizure because Smith did not fall and was not reported confused. He found unlikely a transient ischemic attack because not falling would be unusual (although not impossible) and the lack of occluded carotid arteries suggested no likely cause. He also doubted blood clot or air bubbles caused by Smith's patent foramen ovale because the hospital trans-esophageal echocardiogram showed no remaining evidence of a clot or air bubbles. Again this was not dispositive. Small clots or completely broken off clots could have occurred causing stroke. However Scheidt thought it highly unlikely that 24 hours later there would have been no remaining evidence.

In sum, Dr. Scheidt thought that various types of stroke, fainting or seizures were unlikely to have caused Smith's loss of consciousness. In no case was he able to rule out the particular cause but in each case argued it unlikely. The government could not disprove non culpable medical causes; it only showed that they were possible but unlikely.

Dr. Ehlert testified about the tilt table test he conducted while Smith was hospitalized, 10 days after the accident. In that test, when Smith was raised from supine to upright position his blood pressure fell causing near loss of consciousness. Ehlert initially concluded that Smith suffered from orthostatic hypotension which was drop of blood pressure associated with change

of position. He later discounted his earlier diagnosis after considering the impact of the ten days hospitalization and multiple medications which Smith was taking. He thought the test unreliable and unpredictive under those circumstances.

The government's Fatico presentation attempted to rule out non culpable medical causes of Smith's lapse. Their evidence demonstrated that various types of stroke and fainting caused by Smith's panoply of illnesses were unlikely.

The conclusion of the National Transportation Safety Board investigation into the crash is far less certain that medical problems did not cause the lapse. The NTSB concluded "...The cause of the assistant captain's unresponsiveness to cues clearly indicating an impending allison could not be determined":

> The assistant captain had been diagnosed with chronic back pain and had been taking a prescribed pain reliever, Tramadol, for several years. A side effect of this medication, as documented by the manufacturer is an increased risk of seizures. The episode that the assistant captain experienced was potentially consistent with a brief, nongeneralized seizure, with symptoms such as the temporary inability to maintain normal awareness of and contact with the environment. Episodes such as these are usually followed by a full recovery of alertness after a transition that can last anywhere ftom seconds up to an hour. However, other factors , such as the lack of information regarding when the assistant captain had last taken Tramadol, the lack of a previous reported seizure, and the absence of supporting evidence from extensive neurological and cardiovascular tests, do not support such a determination.

> A postoperative cardiac examination after the assistant captain's suicide attempt found a congenital heart abnormality (patent foramen ovale). The defect, which would not have been detected in routine cardiac examinations and would not have affected his day-to-day activities or his job performance, increased the likelihood of a transient ischemic attack (TIA) or "mini-stroke, " a condition that might have matched the symptoms that the assistant captain manifested at the time of the accident. TIAs by definition do not result in lasting changes to the brain. Both seizures and TIAs cause similar effects--a temporary loss of responsiveness, with or without concurrent physical manifestations--and both leave no evidence of their presence afterward. Given the absence of evidence from the extensive cardiological and neurological examinations that the assistant captain underwent following his suicide attempt, as well

as the absence of evidence to allow a determination of fatigue or other physiological or behavioral factor, the Safety Board is unable to determine what, if any medical factor alone or in combination, led to the assistant captain's failure to respond to the cues of the impending allision. Although these medical events are somewhat consistent with the assistant captain's actions in the minutes preceding the accident, none is especially compelling, and there are insufficient data to determine which, if any, might have occurred. Therefore, the Safety Board concludes that the cause of the assistant captain's unresponsiveness to cues clearly indicating an impending allision could not be determined.

N.T.S.B Marine Accident Report, pp.57-58

While government argued that non culpable medical causes were unlikely, the NTSB found that on the evidence it had the cause could not be determined at all.

The totality of the government's medical evidence was that stroke, seizure, fainting or other medical event was unlikely. However none of the medical causes could be conclusively ruled out.

Smith admitted falling asleep. He admitted culpability for falling asleep and thus for causing the crash by reporting for work out of condition. The government corroborates that sleep was the cause and that it was culpable by the evidence of tiredness from the family, the statement to the deckhand in the morning that he almost did not come to work and the post crash statement to Gansas by Smith that he must have passed out. The government further corroborates sleep as the cause by its evidence that innocent alternate causes, stroke, seizure or fainting were unlikely.

Smith's guilty plea is legally sufficient to constitute Seaman's Manslaughter. He makes out working with inadequate sleep and while physically tired. He acknowledges knowing that he should not have done so. The family evidence and statements to the deck hand and Gansas corroborate that this is so. The expert testimony corroborates that a sleep episode was likely. Smith's admission to culpably falling asleep is factually sufficient to make out Seaman's Manslaughter.

Respectfully yours,

Peter Kirchheimer, Esq.

PK/aic

c:  AUSA Frisch (631-715-7922)

Joel Cohen

Alan Abramson (212) 226-4559)

Clerk of the Court